IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

FILED

MAR - 4 2020

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

**BACK BAY RESTORATION**
**FOUNDATION, LTD.,**

      Plaintiff,

v.                                    Civil No. 2:19-cv-323

**UNITED STATES ARMY CORPS.**
**OF ENGINEERS,**

      Defendant,

and

**HOFD ASHVILLE PARK, LLC,**

      Intervening Defendant.

## OPINION & ORDER

These matters are before the Court on cross motions for summary judgment, a motion to strike and a motion for preliminary injunction. The first Motion for Summary Judgment was filed by Plaintiff Back Bay Restoration Foundation, LTD. ("Back Bay") on August 28, 2019. Doc. 23. Defendant United States Army Corps of Engineers ("Corps") filed its Motion for Summary Judgment on September 30, 2019. Doc. 28. Intervenor Defendant HOFD Ashville Park, LLC ("HOFD") filed its Motion for Summary Judgment on October 1, 2019. Doc. 30. HOFD has additionally filed a Motion to Strike the Affidavit of Jared Brandwein ("Brandwein Affidavit"). Doc. 26. Back Bay has now filed a Second Motion for Preliminary Injunction. Doc. 39. Its First Motion for Preliminary Injunction was previously withdrawn. See Doc. 12. All matters have been fully briefed and are ripe for disposition by the Court. Therefore, for the following reasons herein, the Court: (1) **GRANTS**, in part, and **DENIES**, in part, HOFD's Motion to Strike the Affidavit of

Jared Brandwein; (2) **DENIES** Back Bay's Motion for Summary Judgment; (3) **GRANTS** the Corps' Motion for Summary Judgment; and (4) **DENIES** Back Bay's Second Motion for Preliminary Injunction as **MOOT**. Upon granting summary judgment for the Corps, counsel for HOFD informed the Court that its Motion for Summary Judgment is now moot. Therefore, the Court **DENIES** HOFD Motion for Summary Judgment as **MOOT**.

## I. BACKGROUND

This case concerns Permit Number NAO-2001-02223/18-V1872 ("permit") issued by the Corps to Defendant-Intervenor HOFD under Section 404 of the Clean Water Act ("CWA"). The permit authorizes HOFD to discharge dredged or fill material impacting 0.31 acres of open water and 1.18 acres of wetlands, for a total of 1.49 acres of "waters of the United States" regulated by the CWA. These impacts are associated with HOFD's development of an additional portion of an existing residential subdivision in Virginia Beach. Specifically, the impacts are from: (a) construction of City-required storm water improvements to limit storm-based flooding to roads and existing residences; (b) grading for additional lot development; and (c) creation of an equestrian/pedestrian trail and parking for that trail. Plaintiff Back Bay has challenged the issuance of the permit under the Administrative Procedure Act ("APA").

## II. MOTION TO STRIKE BRANDWEIN AFFIDAVIT

HOFD has filed a Motion to Strike the Affidavit of Jared Brandwein. Doc. 26. HOFD avers that it is improper for Back Bay to attach and rely on the Brandwein Affidavit for purposes of summary judgment. HOFD highlights that the affidavit is not apart of the administrative record. Additionally, HOFD notes that the affidavit does not fall under any exception that would require the Court to consider it as extra-record evidence in adjudicating the merits of the claim. Back Bay

counters that the affidavit serves as "a document offered to establish the standing of the Plaintiff to bring the action." Doc. 32.

Generally, courts will "assume that the administrative record is complete and exclusive for purposes of judicial review." Sanitary Bd. of Charleston v. Wheeler, 918 F.3d 324, 334 (2019). There are exceptions to this general rule. However, the "party challenging an agency bears a special burden of demonstrating that the court should reach beyond the record . . . ." Id. Back Bay has conceded that "[i]nforming the Court of the Plaintiff's standing was the sole purpose of the Affidavit." Doc. 33 at 3. The Corps and HOFD agree that an affidavit may be used to establish standing under applicable law. See Doc. 29 at 22 n.1; Doc. 34 at 1. Consequently, HOFD moves to strike the Affidavit in so far as it is being used to support Back Bay's claims on the merits. The Court agrees with HOFD. The Court **FINDS** that Back Bay has failed to meet the burden that the Court should reach beyond the administrative record.

Therefore, in so far as the Affidavit is used to establish standing, the Court **DENIES** HOFD's Motion to Strike. Accordingly, the Court admits the information in paragraphs one through four as well as the first sentence of paragraph five[1] is relevant to establish Back Bay's standing. In so far as the rest of the Brandwein Affidavit is used as extra-record evidence to support the merits of the claims, the Court **GRANTS** the Motion to Strike. Therefore, the Court **STRIKES** paragraph five except the previously noted first sentence. Additionally, the Court **STRIKES** paragraph six and seven of the Brandwein Affidavit and the attachment marked as Exhibit 1. Because no part of these paragraphs or the additional exhibit are relevant to establish Back Bay's standing, they are properly struck.

---

[1] HOFD concedes that the first sentence may be relevant to standing. Doc. 34 at 3. The first sentence begins with "On February 11, 2019, BBRF requested a public hearing . . . ."

3

## III. CROSS MOTIONS FOR SUMMARY JUDGMENT

### A. Undisputed Facts

This case involves judicial review of an agency decision under the Administrative Procedures Act. Due to the nature of the proceeding, the APA "confines judicial review of agency decisions to the administrative record . . . ." Owusu-Boakye v. Barr, 376 F. Supp. 3d 663, 667 (E.D. Va. 2019). Accordingly, in an APA case "all relevant facts are contained in the administrative record for such a case, and, as a result, there are no material facts in dispute." Id. Therefore, the Court will review those facts highlighted in the administrative record for purposes of summary judgment. Here, the administrative record reflects the following facts:

1. The project proponent, HOFD, submitted its permit application for a CWA permit in November 2018. AR02104-21.

2. The Corps determined on December 11, 2018, that the application was complete for purposes of a CWA 404 permit. AR02100-02.

3. The Corps issued a public notice in December 2018 describing the proposed permit, what the Corps would be evaluating in reaching its decision, and the Corps' preliminary views on the matter, and soliciting comments from the public and other stakeholders. See AR02041-42.

4. The notice was posted on the Corps Norfolk District's website and sent via email directly to more than a hundred individuals and organizations, including Back Bay. AR02028-29.

5. The original comment period was thirty days (AR002042), but the Corps extended that deadline—including for the benefit of Back Bay—eventually accepting comments into late-February 2019. See AR01832-33; AR01483-84.

6. The Corps received dozens of comments in response, including from Back Bay. See AR01270-71; AR01723-30.

4

7. On May 22, 2019, the Corps, relying upon an Environmental Assessment and Statement of Findings, made a finding of no significant impact under the National Environmental Policy Act ("NEPA"), and determined that the proposed discharges comply with the CWA's Section 404(b)(1) Guidelines and that the proposed project is not contrary to the public interest. See AR00163-209; AR00208.

8. After considering public and stakeholder comments, the Corps concluded a public hearing was not likely to result in any substantive new information relevant to the required analyses. See AR00101-02.

9. The Corps proffered the permit to the HOFD on May 22, 2019. See AR00124-25.

10. The permittee signed the permit on June 24, 2019, and the Corps countersigned—thus validating the permit—on July 12, 2019. See AR00001-6 (with signatures); AR00126-48 (permit with attachments).

11. The CWA permit authorizes HOFD to discharge dredged or fill material impacting 0.31 acres of open water and 1.18 acres of wetlands, for a total of 1.49 acres of "waters of the United States" regulated by the CWA. These impacts are associated with HOFD's development of an additional portion of an existing residential subdivision in Virginia Beach. Specifically, the impacts are from: (a) construction of City-required storm water improvements to limit storm-based flooding to roads and existing residences; (b) grading for additional lot development; and (c) creation of an equestrian/pedestrian trail and parking for that trail. AR00001-06; AR00163.

12. To mitigate for the wetlands impacts authorized by the CWA 404 permit, the permit includes a condition that HOFD must purchase credits to fund the creation of additional wetlands. AR0001; AR00165; AR00202.

13. The Corps documented its permit application review in its 47-page Environmental Assessment and Statement of Findings, AR00163-AR00209, and in other parts of the record, based upon the documents in the administrative record.

14. The Corps applied the presumption for non-water dependent projects in the practicable alternatives analysis under the 404(b)(1) Guidelines and documented its finding that the presumption was rebutted and that the applicant's preferred alternative is the least environmentally damaging practicable alternative. AR00185; AR00181-85.

15. The proposed project has two overall project purposes: to "[i]mprove drainage deficiencies in the Ashville Park subdivision as identified by the City of Virginia Beach" and "to provide new housing options for purchasers in southern Virginia Beach, to meet the shortage of new housing availability." AR00168.

16. The Corps concluded based on information in the administrative record that off-site alternatives are not feasible to achieve the first overall project purpose because the City researched and designed necessary storm water and drainage requirements over many years and they must be performed within the Ashville Park development to reduce the risk of flooding. See AR00183; AR02196-301; AR00166; AR00172-73; AR00175-79.

17. The Corps concluded that three off-site alternatives are not practicable to meet the second overall project purpose, based upon its review of the record information, including that existing infrastructure (such as a network of roads, sewer and water) has already been developed at the applicant's preferred location and would have to be constructed at alternatives sites, representing approximately $20 million additional costs; the alternatives are all owned by other entities and would have to be purchased and rezoned; the alternative sites contain wetlands that

may be impacted by development; some alternatives lacks sufficient developable area or are not for sale. AR00183; AR00259.

18. The Corps found four on-site alternatives were either impracticable, because the required storm water improvements necessary to reduce flooding risks would not properly serve their intended function at these alternative sites, or that the alternatives would result in greater environmental damage because they would impact more wetlands than the applicant's preferred alternative. AR00184-85.

19. The CWA permit application, see AR02105-94, proposed to avoid significant impacts to 32 acres of wetlands on the overall site and during the permit process reduced the proposed impact from 3.40 acres to 1.49 acres of wetlands and open waters, by modifying and relocating a storm water pond and certain grading. AR00202-203; AR00172-173.

20. Back Bay's comments on the proposed project did not recommend that the Corps consider whether flood reduction could be achieved by securing drainage easements on alternative sites, or whether additional housing could be constructed by evaluating the practicability of rezoning alternative sites. AR 01742-44.

21. The applicant and the Corps considered and addressed each of EPA's comments on the permit application. See, e.g., AR01080-148 (showing applicant's responses to EPA's comments); AR00170-AR00174 (highlighting Corps' consideration of EPA's comments and the applicant's responses).

22. After the Corps discussed with EPA each of EPA's comments and the applicants' responses, EPA responded on May 15, 2019, that it had no further comments on the project. AR00384; AR00170-74.

23. The administrative record for judicial review in this case is for the Corps' CWA permit decision, and not any Virginia Water Protection permit issued by the Virginia DEQ under state law. See AR00001-9; AR00163-209.

24. Virginia DEQ authorized the proposed project on May 15, 2019, under State law through a Virginia Water Protection general permit. AR00345-376.

25. HOFD provided information on the wetlands that would be impacted by the proposed project, and these wetlands are not high quality. AR01081; see also AR00110-001108 ("Information on Quality of Wetlands"); AR00167 & AR00172-73.

26. Most of the wetlands that would be impacted by the proposed project were inadvertently created due to improper grading in the early 2000s. AR00167; AR00110-00118.

27. The administrative record for judicial review documents the basis for the Corps' conclusion that issuance of the CWA permit would not be contrary to the public interest. AR00195-98; AR00208; see also AR00181-85; AR00172-173; AR000175-79.

**B. Legal Standard and Analysis**

The Clean Water Act does not specifically set forward a standard of review for Corps' permit decisions. Therefore, courts have adopted the standard articulated in the Administrative Procedures Act. 5 U.S.C. §§ 701 et seq. The APA provides that a court shall set aside agency "findings, conclusions and actions that are 'arbitrary capricious, an abuse of discretion, or otherwise not in accordance with law', or that fail to meet statutory, procedural or constitutional requirements." Avoyelles Sportsmen's League, Inc. v. Marsh, 715 F.2d 897, 904 (5th Cir. 1983) (citing 5 U.S.C. §§ 706(2)(A)-(D); Nat'l Wildlife Fed'n v. Hanson, 859 F.2d 313, 316 (4th Cir. 1988). Accordingly, the standard of review is highly deferential to the agency and the Court "is not empowered to substitute its judgment for that of the agency." Hughes River Watershed

8

Conservancy v. Johnson, 165 F.3d 283, 288 (4th Cir. 1999). Therefore, an action is arbitrary or capricious if the agency "relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." Id. at 287-88.

Here, Back Bay challenges the granting of the permit by the Corps as an arbitrary and capricious agency action. Back Bay argues that the granting of the permit was arbitrary and capricious because the Corps failed to: (1) comply with the Clean Water Act's Guidelines; (2) perform a public interest review; (3) issue a permit on a completed application; and (4) conduct a public hearing as required by the National Environmental Policy Act. These arguments have no merit.

*i. Clean Water Act Guidelines and Public Interest Review*

The objective of the Clean Water Act "is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. The CWA prohibits the unauthorized discharge of pollutants in the "navigable waters" of the United States. Id. § 1311 (a).[2] Section 404(a) of the CWA authorizes the Secretary of the Army, acting through the Corps, to issue permits for the discharge of dredged and fill material into navigable waters "after notice and opportunity for public hearings." 33 U.S.C. § 1344. To issue a permit, the Corps must comply with Environmental Protection Agency ("EPA") regulations under the CWA. 33 U.S.C. § 1344(b)(1). These regulations are commonly known as the 404(b)(1) Guidelines ("Guidelines"). 40 C.F.R. § 230.10. The Guidelines require that the discharge will not cause significant adverse effects on human health/welfare, aquatic life or the aquatic ecosystem. 40 C.F.R. § 230.10(c)(1)-(3).

---

[2] The "navigable waters" regulated by the CWA includes aquatic resources, such as wetlands. Rapanos v. United States, 547 U.S. 715 (2006).

Furthermore, the Guidelines prohibit the Corps from granting a permit "if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." Id. § 230.10(a); see City Club of N.Y. v. United States Army Corps of Eng'rs, 246 F. Supp. 3d 860, 865 (S.D.N.Y. 2017). The issuance of a permit also requires the Corps to conduct a public interest review. 33 C.F.R. § 320.4. Therefore, Section 320.4(a) requires a permit to comply with the Guidelines and not be contrary to the public interest. Id. § 320.4(a)(1); see City Club of N.Y., 264 F. Supp. 3d. at 865.

The Guidelines lay out a clear framework for determining whether an alternative to the proposed discharge site is practicable. An alternative is practicable "if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). To be practicable, an alternative need not be owned by the permit applicant if it "could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity . . . ." Id. Discharge into a "special aquatic site" is a key factor under the Corps permit analysis. Id. § 230.10(a)(3); see City Club of N.Y., 264 F. Supp. 3d. at 865. If a proposed permit is seeking discharge into a "special aquatic site", such as wetlands, the Corp will undertake a two-step analysis in determining whether to grant a permit. First, the Corps will define the "basic purpose" of the project under 40 C.F.R. § 230.10(a)(3). City Club of N.Y., 264 F. Supp. 3d. at 865. Second, the Corps will determine if that "basic purpose" is "water dependent." Id. A "basic purpose" is not water dependent when it does not require access or proximity to or siting within the special aquatic site in question . . . ." 40 C.F.R. § 230.10(a)(3). The determination of a project's basic purpose and water dependence are threshold questions and must be stated by the Corps. See Van Antwerp, 362 Fed. App'x. at 106.

If a wrong decision is made on the classification of a project, then the granting of a permit would be de facto arbitrary. See id.

Once a project is classified as non-water dependent, the Corps will first presume that "practicable alternatives to the project are available in less sensitive areas", City Club of N.Y., 264 F. Supp. 3d. at 866 (citing 40 C.F.R. § 230.10(a)(3)), and second that "such practicable alternatives have less adverse impact on the aquatic ecosystem," Id. Accordingly, a classification of non-water dependence shifts the burden to the applicant to rebut the first presumption by clearly demonstrating that a practicable alternative is not available and the second presumption by proving with "detailed, clear, and convincing information" that an alternative with less adverse impact is impracticable. Sierra Club v. Van Antwerp, 362 Fed. App'x. 100, 106 (11th Cir. 2010). The evidence to rebut the presumption need not require a specific level of detail, "but only record evidence the agency took a hard look at the proposals and reached a meaningful conclusion based on the evidence." Hillsdale Envtl. Loss Prevention, Inc. v. United States Army Corps of Eng'rs, 702 F.3d 1156, 1168 (10th Cir. 2012).

Here, the Corps considered the primary purpose of the project to be the improvement of "drainage deficiencies in the Ashville Park subdivision as identified by the City of Virginia Beach." AR00168. The Corps further explained that this is necessary because "the City has been researching this system for many years and must perform improvements within Ashville Park to reduce the recurrent flooding of these [local] residents." AR00183. The Corps noted a secondary purpose of the project was "to provide new housing options for purchasers in southern Virginia Beach, to meet the shortage of new housing availability." AR00168. The Corps considered these purposes and determined that they were non-water dependent. AR00185; AR00181-85. Therefore, the Corps applied the presumption for non-water dependent projects. Id. In its findings the Corps

highlighted that "the applicant has demonstrated that there are no practicable alternatives that do not involve special aquatic sites ... [and] there are not alternatives to the proposed discharge that would be less environmentally damaging." AR00185. The Corps, in its report, specifically evaluated three off-sites alternatives and concluded that these sites were not practicable. AR00183. The Corps determined:

> that each of the off-site alternatives lacks the existing infrastructure already developed at the applicant's preferred location (*e.g.*, a roadway network, sewer and water) to accommodate additional housing development; that the alternatives are all owned by other entities and would have to be purchased and rezoned; that developing the alternatives may require wetland impacts and at one alternative the wetland impacts would likely be significant; that one of the alternatives lacks sufficient developable area; and the owner of another alternative site is not willing to sell.

Doc. 29 at 26; see AR00183; AR00259. The additional cost needed to make the alternative's sites practicable considering the project's purpose would be approximately $20 million. AR00259. The Guidelines plainly consider this situation and only require acquisition of non-owned alternatives if they can "reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity." 40 C.F.R. § 230.10(a)(2). The record is clear that the off-site alternatives were considered and found to be not practicable because they could not be reasonably obtained and utilized. See AR00183. Moreover, the Corps evaluated four on site alternatives in addition to the preferred site and determined that:

> On-site alternatives 2, 3 and 4 are not practicable because they do not allow for the development of stormwater pond 10A, required by the City of Virginia Beach. On-site alternatives 1 [i.e., the applicant's preferred proposal, as modified during the permit process] and 5 [i.e., the applicant's original proposal] are practicable as they both meet the project purpose and need. However, on-site alternative 5 has more wetland impacts and is not the least damaging practicable alternative.

Doc. 29 at 26 (quoting AR00184). The record is clear that HOFD presented evidence to the Corps to defeat the practicable presumption. The Corps analyzed the collection of evidence and determined that there were no practicable alternatives to HOFD preferred project location.

Back Bay contends that there may be hypothetical alternatives that could be re-zoned. See Doc. 24 at 13. But it does not pinpoint any specific location that fulfills the projects objectives and meets the practicable standard. The Guidelines understandably do not require the Corps to consider every speculative alternative. It is apparent that "[t]he specific location of the project may be an important aspect of fulfilling the overall project purpose . . . [as such] location can limit what alternatives are considered practicable." Town of Abita Springs v. United States Army Corps of Eng'rs, 153 F. Supp. 3d 894, 920 (E.D. La 2015). Here, the Corps properly considered the primary purpose of the project was to address "drainage deficiencies in the Ashville Park subdivision." The project's purpose is plainly location dependent as it is focused on addressing flooding concerns within the Ashville Park subdivision. Accordingly, the projects purpose would be thwarted if the Corps or HOFD was forced to consider all non-proximate alternatives in their evaluations. See id. at 920-21. Therefore, it was within the proper discretion of the Corps to only consider those alternatives within a certain proximity to Ashville Park. The record is apparent that the Corps properly evaluated alternatives, in light of this purpose, and found them to be "impracticable or would result in greater environmental impacts." Doc. 11 at 16. The Corps has complied with the Guidelines regarding the consideration of practicable alternatives.

Back Bay notes that the HOFD in its application "did not propose to avoid destroying WOTUS [Waters of The United States]." Doc. 24 at 13. This is contrary to the evidence. The record reflects that HOFD did in fact take steps to limit the projects effect on Waters of the United States. Based partly on comments by the EPA, HOFD modified the application by both removing Village D from the proposed plan, AR20108-09; AR00202-03, and moving the location and configuration of a planned Stormwater Pond, see AR00173. This modification effectively reduced the proposed wetlands impact from 3.40 acres to 1.49 acres. AR00202-203; AR00172-173.

Furthermore, the permit includes a condition that HOFD must purchase credits to fund the creation of additional wetlands. AR0001; AR00165; AR00202. It is plainly apparent from the record that the Corps and HOFD acted to limit the projects impacts on nearby wetlands.

Moreover, Back Bay avers that the administrative record is void of any public interest review by the Corps as required by 33 C.F.R. § 320.4(a). Doc. 24 at 16. In the Corps public interest review "[t]he benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments." Ohio Valley Envtl. Coalition v. Aracoma Coal Co., 556 F.3d 177, 191 (4th Cir. 2009) (quoting 33 C.F.R. § 320.4(a)). This process "requires extensive review and coordination with numerous federal and state agencies, as well as significant consideration of the public interest." Id. at 191. The record reflects that the Corps complied with its public interest review obligation. The Corps actively involved agencies and the public in the comment period for the permit application process. Both the EPA and the U.S. Fish and Wildlife Service ("FWS") provided comments to the proposed project. See AR01736-41; AR01483. In addition, the Corps received around thirty comments from Back Bay and private individuals. See Doc. 29 at 10. As previously noted, the project was modified by the applicant, based on the EPA's suggestion, to reduce the impacts to wetlands. See id. After this modification, the EPA declined to issue further comment on the project. AR00171-74. The Corps published detailed responses to the agencies' comments in its final Environmental Assessment and Statement of Findings ("EA") AR00163-209. As a result, the Corps clearly gave "'full consideration" to the agencies comments. See Sierra Club v. United States Army Corps of Eng'rs, 772 F.2d 1043, 1054 (2nd Cir. 1985) (noting that solicitation of other agencies' views and providing detailed responses to those agencies meets the full consideration standard); Stewart v. Potts, 996 F. Supp. 668, 678-79 (S.D. Tex. 1998)

(highlighting that the Corps met its obligations by soliciting the EPA and FWS opinions and "responding to their comments in the EA.").

*ii. Incomplete Application*

Back Bay contends that the application for the permit was incomplete and therefore the issuance of a Permit was arbitrary and capricious. This argument fails for two reasons: (1) Back Bay relies exclusively on Exhibit One to the Brandwein Affidavit, that the Court has previous struck as extra-record evidence; and (2) that Back Bay waived the incomplete application argument when they failed to raise it during the period for public comment.

The content of a CWA Section 404 permit application is laid out in 33 C.F.R. § 325.1(d). Back Bay cannot use an extra-record document to support its claim that the application was incomplete. Additionally, the record reflects the Corps applied the regulations and found that the application was not lacking. AR02100-02. Back Bay did not and currently does not argue that the application failed to comply with the permit application regulation. See Doc. 24 at 14-15. As noted, by both the Corps and HOFD, Back Bay did not raise an incomplete application argument in its public comment on the project. See AR01742. "[T]o find waiver of an issue, the Court must first determine whether that issue was presented to the Corps during the public comment period." Sierra Club, Inc. v. Bostick, No. CIV-12-742-R, 2013 U.S. Dist. LEXIS 181087, at *22 (W.D. Okla. Dec. 30, 2013). If the issue was raised during the comment procedure then "that issue may be challenged in judicial proceedings, by the original objector or any other person." Id. at 21.

Here, the issue of an incomplete application was not raised by Back Bay or another objector in the public comment phase. Accordingly, the Court determines that Back Bay waived its argument that the permit application was incomplete. The Court should not substitute its judgment for that of the agency, especially when the agency has not had an opportunity in the first instance

15

to respond to the objector. See New Mexico Environmental Imp. Div. v. Thomas, 789 F.2d 825, 835 (10th Cir. 1986). Accordingly, Back Bay cannot raise the argument now on judicial review without a chance for the agency to have addressed it in the first instance. See id. (noting that because Plaintiff did not "advance[] any dissatisfaction" through public comment – the argument had been waived). The Court should not consider any information or material that the Back Bay failed to present to the Corps during the comment period. See id. at 835-36.

### iii. Failure to Conduct a Hearing

Furthermore, Back Bay contends that the Corps violated NEPA's regulations when it failed to conduct public hearings. Doc. 40 at 16-17; see C.F.R. § 1501.4(b). It also contends that the Corps did not offer the public the ability to comment on the Environmental Assessment as the EA was published on the same day the permit was issued. Under NEPA, "federal agencies must take a "hard look" at the potential environmental consequences of their actions." Ohio Valley Envtl. Coalition v. Aracoma Coal Co., 556 F.3d 177, 191 (4th Cir. 2009). An EA is simply a "concise public document . . . that serves to . . . [b]riefly provide sufficient evidence and analysis for determining whether to prepare an [Environmental Impact Statement ("EIS")] or a finding of no significant impact [("FONSI")]."Id. (qouting 40 C.F.R. § 1509.9(a)(1)). The regulations highlight that the requirement of public involvement is not as high when an EA is prepared instead of an EIS. Id. (citing Town of Rye v. Skinner, F.2d 23, 24 (2nd Cir. 1990); see Greater Yellowstone Coalition v. Flowers, 359 F.3d 1257 (10th Cir. 2004) (comparing the regulations different standards of public involvement when preparing an EA compared to an EIS). Therefore, under the regulations, the Corps "is required to involve the public in the preparation of an EA 'to the extent practicable.'" Northwest Envtl. Defense Ctr. v. Wood, 947 F. Supp. 1371, 1386 (D. Or. 1996) (quoting 40 C.F.R. § 1501.4(b) (emphasis added)).

The Corps issued a notice inviting public comment on the proposed permit. AR02028-29; AR02040-42. This notice was provided to property owners in the Ashville Park area and posted online on the Corps Norfolk District website. See AR 02031-33. The notice provided a detailed description of the proposed work, the proposed projects purpose, and established a deadline for public comments. AR02067-73. The original comment period was thirty days (AR002042), but the Corps, based on comments by Back Bay, extended the submission of comments into late February 2019. See AR01832-33; AR01483-84. During that time, the Corps received a collection of public comments. The Corps project manager consistently responded to the comments sent to it by Back Bay and other interested private parties. See AR01270-71. After this period, the Corps published an EA with a FONSI. See AR00163-209; AR00208. On the same day, the Corps issued the permit to HOFD. See AR00124-25.

Back Bay contends the release of the EA and the permit on the same day prevented "any public involvement whatsoever in the review and preparation of the EA as required by the regulations." Doc. 24 at 17. This is not the standard required by the regulations. "[T]he vast majority of circuits . . . have found that the regulations do not require an agency to circulate an EA for public comment" to meet the practicable standard. Montrose Parkway Alternatives Coalition v. United States Army Corps of Eng'rs, 405 F. Supp.2d 587, 596 (D. Md. 2005) (examining rulings from 1st, 2nd, 8th and 10th Circuits). The record highlights that the Corps identified the proposed project purposes in the public notice and allowed ample opportunity for public comment on the project. The Corps, additionally, responded to comments and engaged significantly with the public in the permit process. It is not a requirement for the Corps to hold a hearing simply to re-hear public concerns that have been presented, responded to, and acted upon. See AR00101-02. The comment period was sufficiently long for the public to provide comment to the Corps and for the

17

Corps to incorporate those comments into the EA. Therefore, a public hearing as well as circulation of the EA before issuance of the permit was not required. The Corps complied with the mandate of the regulations to involve the public to the extent practicable.

In conclusion, the Corps issuance of the permit was not arbitrary and capricious. Therefore, the Corps' Motion for Summary Judgment is **GRANTED**.

## IV. PRELIMINARY INJUNCTION

Since the Court has rendered a decision on the merits in favor of the Corps - a preliminary injunction is no longer appropriate. Accordingly, the Court **DENIES** Back Bay's Second Motion for a Preliminary Injunction as **MOOT**.

## V. CONCLUSION

For the following reasons herein, the Court: (1) **GRANTS**, in part, and **DENIES**, in part, HOFD's Motion to Strike the Affidavit of Jared Brandwein; (2) **DENIES** Back Bay's Motion for Summary Judgment; (3) **GRANTS** the Corps' Motion for Summary Judgment; and (4) **DENIES** Back Bay's Second Motion for Preliminary Injunction as **MOOT**. Upon granting summary judgment for the Corps, counsel for HOFD informed the Court that its Motion for Summary Judgment is now moot. Therefore, the Court **DENIES** HOFD Motion for Summary Judgment as **MOOT**.

The Clerk is **REQUESTED** to electronically deliver a copy of this Opinion & Order to all counsel of record. It is **SO ORDERED**.

/s/
Henry Coke Morgan, Jr.
Senior United States District Judge

HENRY COKE MORGAN, JR.
SENIOR UNITED STATES DISTRICT JUDGE

March 4, 2020

Norfolk, Virginia